**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CHRISTOPHER J. BREKKA, | ) |
| 4271 Sunrise Flats St. | ) |
| Las Vegas, Nevada 89135 | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MEDEQUITIES REALTY TRUST, INC., | ) |
| c/o National Corporate Research Ltd. | ) |
| 1519 York Road | ) |
| Lutherville , MD 21093, | ) |
| | ) |
| JOHN W. MCROBERTS, | ) |
| c/o National Corporate Research Ltd. | ) |
| 1519 York Road | ) |
| Lutherville , MD 21093, | ) |
| | ) |
| WILLIAM C. HARLAN, | ) |
| c/o National Corporate Research Ltd. | ) |
| 1519 York Road | ) |
| Lutherville , MD 21093, | ) |
| | ) |
| RANDALL L. CHURCHEY, | ) |
| c/o National Corporate Research Ltd. | ) |
| 1519 York Road | ) |
| Lutherville , MD 21093, | ) |
| | ) |
| JOHN N. FOY, | ) |
| c/o National Corporate Research Ltd. | ) |
| 1519 York Road | ) |
| Lutherville , MD 21093, | ) |
| | ) |
| STEVEN I. GERINGER, | ) |
| c/o National Corporate Research Ltd. | ) |
| 1519 York Road | ) |
| Lutherville , MD 21093, | ) |
| | ) |
| STEPHEN L. GUILLARD, | ) |
| c/o National Corporate Research Ltd. | ) |
| 1519 York Road | ) |
| Lutherville , MD 21093, | ) |

Case No. _____

COMPLAINT

JURY TRIAL DEMANDED

ELLIOTT MANDELBAUM )
c/o National Corporate Research Ltd. )
1519 York Road )
Lutherville , MD 21093, )
)
TODD W. MANSFIELD, )
c/o National Corporate Research Ltd. )
1519 York Road )
Lutherville , MD 21093, )
)
STUART C. MCWHORTER )
c/o National Corporate Research Ltd. )
1519 York Road )
Lutherville , MD 21093, )
)
and )
)
OMEGA HEALTHCARE INVESTORS, INC. )
303 International Circle )
Suite 200 )
Hunt Valley, MD 21030 )
)
                Defendants. )
)
)

Plaintiff Christopher J. Brekka ("Plaintiff"), alleges the following upon information and

belief, including investigation of counsel and review of publicly-available information, except as

to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1.      Plaintiff brings this action against MedEquities Realty Trust, Inc. ("MedEquities"

or the "Company") and against MedEquities' Board of Directors (the "Board" or the "Individual

Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of

1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the

Board's attempt to sell the Company to Omega Healthcare Investors, Inc. ("Omega").

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading registration statement (the "S-4") to be filed with the Securities and Exchange Commission ("SEC") on February 11, 2019. The S-4 recommends that MedEquities stockholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby MedEquities is acquired by Omega. The Proposed Transaction was first disclosed on January 2, 2019, when MedEquities and Omega announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which MedEquities stockholders will receive 0.235 shares of Omega common stock and $2.00 for each share of MedEquities common stock that they hold (the "Merger Consideration"). The deal is valued at approximately $600 million and is expected to close in the first half of 2019.

3.      John W. McRoberts, the Company's CEO, worked with Citigroup Global Markets Inc. ("Citi") to steer a sale of MedEquities to Omega. The cited reasons for selling the Company (decreased acquisition opportunities, increased indebtedness, a significant difference between the Company's stock price and the value of MedEquities' assets) weigh in favor of a transaction with a private equity company or another entity with private capital. The cited reasons weigh in favor of a merger consideration that is close to the value of MedEquities' assets and not the stock price. Yet the Board approved a merger with another REIT for a purchase price that significantly undervalues the Company.

4.      Furthermore, the S-4 is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the S-4 contains materially incomplete and misleading information concerning the sales process, financial projections prepared by MedEquities management, as well as the financial

analyses conducted by Citi, MedEquities's financial advisor.

5.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing an amendment to the S-4 with the SEC or otherwise causing an amendment to the S-4 to be disseminated to MedEquities's stockholders, unless and until the material information discussed below is included in any such amendment or otherwise disseminated to MedEquities's stockholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

**PARTIES**

6.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of MedEquities.

7.     Defendant MedEquities is a corporation organized and existing under the laws of the State of Maryland. The Company's principal executive offices are located at 3100 West End Avenue, Suite 1000, Nashville, Tennessee 37203. MedEquities common stock trades on NYSE under the ticker symbol "MRT."

8.     Defendant John W. McRoberts has been Chairman of the Board, CEO and a director of the Company since April 2014.

9.     Defendant William C. Harlan has been President, Chief Operating Officer and a director of the Company since April 2014.

10.     Defendant Randall L. Churchey has been a director of the Company since July 2014.

11.     Defendant John N. Foy has been a director of the Company since July 2014.

4

12.     Defendant Steven I. Geringer has been a director of the Company since August 2015.

13.     Defendant Stephen L. Guillard has been a director of the Company since August 2015.

14.     Defendant Elliott Mandelbaum has been a director of the Company since July 2014.

15.     Defendant Todd W. Mansfield has been a director of the Company since February 2018.

16.     Defendant Stuart C. McWhorter has been a director of the Company since July 2014.

17.     Defendants McRoberts, Harlan, Churchey, Foy, Geringer, Guillard, Mandelbaum, Mansfield and McWhorter are collectively referred to herein as the "Board."

18.     Defendant Omega is a Maryland corporation with its principal executive offices located at 303 International Circle, Suite 200, Hunt Valley, Maryland 21030. Omega common stock trades on NYSE under the ticker symbol "OHI."

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

20.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an

effect in this District; (ii) MedEquities is incorporated in this District; and (iii) a substantial portion

of the transactions and wrongs complained of herein, including Defendants' primary participation

in the wrongful acts detailed herein, occurred in this District.


## FURTHER SUBSTANTIVE ALLEGATIONS

### A.  Citi and the CEO Steer a Sale to Omega

22.     MedEquities, a real estate investment trust ("REIT") that invests in skilled nursing

facilities, behavioral health facilities, hospitals and other healthcare facilities, was formed in April

2014 and went public in October 2016. The Company's strategy is to invest primarily in acute care

hospitals, skilled nursing facilities, short-stay surgical and specialty hospitals and behavioral health

facilities. Most of the facilities in MedEquities' portfolio are skilled nursing facilities, and the

majority of the facilities are located in Texas. MedEquities' assets have increased 275% from $211

million as of December 31, 2014 to $581.6 million as of December 31, 2017.

23.     In January 2018, members of MedEquities' management began discussing a

potential transaction with Party A. From then until mid-July 2018, Party A and MedEquities

performed mutual due diligence and negotiated the terms of transaction. But by July 2018, the

Board decided to end negotiations because of a disagreement on financial terms and due diligence

issues.

24.     Shortly after, Citi approached Defendant McRoberts with a proposal: a potential

business combination between MedEquities and Omega. McRoberts was interested. Twelve days

later, Bloomberg reported that MedEquities was considering a sale of the Company. The article

noted that the Company was working with an unnamed advisor. The very next day, Citi approached

the CEO of Omega to discuss a potential acquisition of MedEquities. On August 17, 2018, Citi called Defendant McRoberts with good news: Omega was interested in a potential transaction with MedEquities.

25.     Omega was not the only company interested in a potential transaction. But Citi and McRoberts steered the Board—and Omega—toward the Proposed Transaction. After Bloomberg reported that MedEquities was considering a sale, three separate parties contacted the Company to express interest: Party B, a financial party; Party C, a strategic party; and Party D, a strategic party. And Party A reached out to McRoberts on September 11, 2018 to inquire about the Company and any updates on the due diligence issues that derailed a transaction between the parties. Yet it was Omega alone that engaged in discussions with MedEquities about a potential purchase price and received multiple net asset value ("NAV") analyses from Citi by September 25, 2018. While Omega had three weeks of access to non-public information before indicating a potential purchase price, McRoberts demanded that Party B and Party C provide a potential purchase price before he would agree to give them access to the same non-public information as Omega. When the Board met on September 25, 2018, McRoberts mentioned only three companies to the Board, including Omega and Party B, despite five parties indicating interest.

26.     Over the next two and half months, McRoberts did what he could to ensure any transaction was with Omega. On September 27, 2018, Party D offered to purchase 21 skilled nursing facilities from MedEquities for $172 to $181 million in cash. That proposal was rejected. Party D tried again on December 10, 2018, offering $8.55 per share to acquire the Company. McRoberts never even responded. Party A contacted McRoberts three more times (September 27, November 13, and December 18, 2018). McRoberts assured Party A each time that there were no "material" updates that would allow a potential transaction with Party A. Party C contacted

McRoberts four more times (October 15, October 22, November 8, and November 20, 2018) to discuss a potential transaction. At a Board meeting on October 15, 2018, McRoberts advised the Board that Party C was too small and had too much debt to be a good match. McRoberts then rebuffed Party C each time it reached out. Party E contacted MedEquities on November 28, 2018 to discuss acquiring some or all of the Company's assets. Party E contacted members of senior management a few more times over the following weeks but, because Party E did not formally submit an indication of interest, no discussions took place.

27.      As McRoberts pushed away Party A, Party C, Party D and Party E, he and Citi performed acrobatics to encourage a potential transaction with Omega. MedEquities and Omega had numerous conversations throughout August and September, as Omega performed due diligence on MedEquities. Citi provided Omega with illustrative NAV analyses on August 16 and September 5, 2018, and then gave Omega a range of exchange ratios for an acquisition of MedEquities, supported with financial analyses, on October 1, 2018.  Omega rewarded the effort on October 11, 2018 with a proposal to acquire the Company in an all-stock transaction with an exchange ratio of 0.333 shares of Omega common stock per share of MedEquities common stock. The proposal represented an implied price of $10.65 per share for MedEquities. Citi discussed Omega's proposal with the Board at a meeting on October 15, 2018. During that same meeting, McRoberts informed the Board that Party B had not received any non-public information because Party B refused to provide a potential purchase price. While the Board gave McRoberts authority to discuss a potential transaction with Party B on September 25, 2018, McRoberts had spent weeks negotiating a non-disclosure agreement with Party B. Only two days of negotiations were necessary before the Company entered into a non-disclosure agreement with Omega, and Omega had access to non-public information for almost a month before providing any sort of potential

purchase price. The Board believed McRoberts and, at the October 15, 2018 meeting, directed him to tell Party B that more information about a range of potential purchase prices was necessary before a non-disclosure agreement could be signed.

28.     The Board could not—and did not—stand up to Citi and McRoberts. At a meeting on October 22, 2018, Citi provided the Board with an analysis of Omega's offer, at which time represented an implied price of $10.92 per share for MedEquities. The Board requested further analysis from Citi of the Company on a stand-alone basis as well as a take-private transaction. After receiving these analyses, the Board decided that a higher exchange ratio than 0.333 was necessary, and insisted on entering into a non-disclosure agreement with Party B. The next day, Citi communicated the Board's concerns to Omega, and almost two weeks later Omega offered an exchange ratio of 0.342, which was later increased to 0.348. Almost immediately upon receiving the revised offer, McRoberts spoke with Party B, which indicated that it was unable to indicate a potential purchase price. Between signing the non-disclosure agreement on October 23, 2018 and November 3, 2018, there were no discussions between MedEquities and Party B, at least according to the S-4. And the S-4 indicates that there were no further discussions between November 3, 2018 and November 12, 2018, when MedEquities terminated discussions with Party B. That day, MedEquities entered into an exclusivity agreement with Omega. The S-4 is silent as to whether the Board approved entry into an exclusivity agreement or approved the exchange ratio of 0.348.

29.     The Board had an opportunity to assert itself and protect stockholder interests when on November 24, 2018, Omega's CEO decided that the agreed-to exchange ratio would no longer work. Omega's share price had increased, which of course increased the implied value of MedEquities. Immediately, Citi and McRoberts met with Defendant Churchey to find a way to keep the deal together. Even though the Company had entered into an exclusivity agreement with

Omega, nothing prevented the Board from deciding to end negotiations. Instead, Citi called Omega two days after Omega balked to discuss alternative transaction structures. Omega informed Citi that it had updated its valuation of MedEquities and decided that the Company's intrinsic value was between $10.00 and $10.50. Despite this, on December 5, 2018, Omega agreed to submit a proposal with an exchange ratio based on a per share price of $11.00 for MedEquities. Yet when Omega sent its revised proposal to Citi on December 13, 2018, the proposed exchange ratio of 0.285 only implied a value for MedEquities of $10.66 per share. Again, nothing prevented the Board from deciding to end negotiations at that time. In just four days the exclusivity agreement would end and the Company could negotiate with any of the parties that had made offers or indicated interest, such as Party B. Instead, Citi made a counterproposal increasing the fixed exchange ratio, implementing a collar and providing a portion of the merger consideration in cash. Omega responded on December 19, 2018 by offering an exchange ratio of 0.230 and $2.02 in cash. The proposal implied a value for MedEquities of $10.43 per share. The next day, the companies agreed to an exchange ratio of 0.235 and $2.00 in cash, which implied a value for MedEquities of $10.57 per share. The deal did not include a collar. On January 1, 2019, the Board approved the Merger Agreement.

30.     Citi and McRoberts steamrolled the Board on its path to a sale to Omega. Despite wanting an exchange ratio greater than 0.333, the Board agreed to the Merger Consideration: $2.00 cash and 0.235 shares of Omega common stock per share of MedEquities common stock. According to Citi, the implied value of the Merger Consideration as of December 31, 2018, the last trading day before the Merger Agreement was executed, is $10.47 per share. An exchange rate of 0.333 would lead to an implied value for MedEquities of $11.70. The Board failed to protect stockholder interests and maximize stockholder value by agreeing to the Proposed Transaction.

31.     The Proposed Transaction makes less sense given that Omega is a REIT itself.

32.     In general, shares of publicly traded REITs trade at a discount or premium to the net asset value of the property held by the REIT (the NAV). In April 2018, Simon Bowler of 2nd Market Capital Advisory Corporation noted that MedEquities' share price as of April 21, 2018 ($9.94) was a 23% discount to the Company's NAV. That would value MedEquities' NAV at $12.90 per share. The Company agreed that the share price reflected a "significant" discount to its NAV and had done so "consistently," as it stated in the S-4.

33.     The way to "unlock" the difference between the NAV and the share price, according to Jeffrey Langbaum, a senior REITS analyst with Bloomberg Intelligence, is to sell the company. And the transactions that lead to a merger consideration closer to NAV than the share price involved private capital or private equity buyers.

34.     Omega is a REIT that invests in long-term care facilities and provides financing to operators of skilled nursing facilities and other healthcare facilities. But Party B is a financial party. And the S-4 specifically states: "MedEquities' ability to grow and diversify through acquisitions of properties and other investments, however, has been adversely impacted by its high cost of capital as compared to that of MedEquities' competitors, which limits its ability to grow through acquisitions, and the significant discount to [NAV] at which the MedEquities common stock as traded." Given that the Company's apparent issues with growth and diversification, and that private capital generally offers a purchase price closer to a REIT's NAV, the Board should have held more discussions with Party B. Instead, the Board sat back while McRoberts and Citi pushed a transaction with Omega.

35.     The materiality of the failure to further discuss a potential transaction with Party B is underscored by the analyses performed by Citi. For example, the *Discounted Cash Flow*

*Analysis* derived an implied value for MedEquities as high as $12.08 per share. The *Selected Public Companies Analysis*, which used estimates of NAV for the Company, derived an implied value for MedEquities as high as $18.13 per share. And the *Selected Precedent Transactions Analysis*, which utilized the ratio of the target company's share premium or discount to its estimated NAV, derived an implied value for MedEquities as high as $18.98 per share.

36.    The other justifications given for entering into the Merger Agreement do not stand up to scrutiny, either. The S-4 states that the Company's "high cost of capital as compared to that of [its] competitors" has "adversely impacted" the Company's ability to grow and diversify its assets.  That "high cost of capital" includes the inability of the Company to issue equity to raise capital because of the Company's decreased stock price. However, from the time the Company went public until September 2018 the stock price traded between $9.75 and $12.75 per share. The Board had ample time to raise equity capital while the stock price remained relatively stable.

37.    The S-4 noted that an October 2018 amendment to the Company's credit facility "significantly limited" its access to borrowing under the credit facility. Before October 2018, the Company boasted of its "ample available liquidity" and $500 million in acquisition opportunities, including in investor presentations dated February 21, May 10, June 4, and June 26, 2018:



38.     In a May 10, 2018 conference call with investors and analysts Defendant McRoberts noted that, while there were $500 million in acquisition opportunities for MedEquities, the Company could not execute on all of the potential acquisitions with its available capital. But MedEquities could "pick and choose the most advantageous" opportunities.

39.     The Company's indebtedness and available capital were not an issue for some analysts. In April 2018, Simon Bowler of 2nd Market Capital Advisory Corporation noted that MedEquities' total debt as a percentage of total capitalization was in line with the healthcare peer median and considered its debt payments "safer" than those of most of the Company's peers.

40.     Even when the Company's indebtedness increased in the second quarter of 2018, McRoberts did not seem to think that it adversely impacted the Company's prospects. In an

investor presentation dated August 8, 2018, the Company stated that it still had a conservative amount of debt, and had sufficient liquidity:





41.    In a conference call with investors and analysts on August 8, 2018, McRoberts stated: "The amount of investments we have in front of us right now combined with what we've locked up with purchase options is the ***right level of activity for us*** at this point."

42.    From the communications with investors throughout 2018, the Company had ample liquidity, a vast number of acquisition opportunities, and had invested the right amount. Yet according to the S-4, the Company's ability to grow "***has*** been adversely impacted" by its indebtedness. If the S-4 is accurate, then McRoberts and the Company lied to investors throughout 2018.

43.     Finally, the Proposed Transaction is the result of an extremely conflicted process. Citi is the lender for MedEquities' credit facility and term loan. According to the S-4, a "representative of Citi" suggested a potential transaction with Omega. It is unclear whether that representative was involved with the credit facility or term loan, or whether the impetus for the suggestion was related to the credit facility or term loan. The S-4 notes that "the lenders under MedEquities' credit facility" contacted the company on August 8, 2018 to discuss an amendment to the credit facility. However, that part of the S-4 does not state that Citi was the lender, and makes it appear as if there were multiple lenders. In its fairness opinion, Citi states that it "acted as lender under MedEquities' existing $300 million revolving credit facility and term loan." That implies that Citi was the only lender under the credit facility and the term loan. This is disconcerting, considering that Citi took a leading role in the sales process, holding discussions with both Omega and MedEquities. The S-4 does not make clear whether any of the persons working on the sale process for Citi were involved with negotiating the amendment to the credit facility. As stated in the S-4, the "lenders under [the] credit facility" had "concerns" with issues related to two of the Company's tenants. If Citi is the only lender, and is concerned with the Company's assets or ability to bring in income, it is a major conflict for Citi to be working with MedEquities on a sale of the Company.

**B.  The Materially Incomplete and Misleading S-4**

44.     The Individual Defendants owe the stockholders a duty of candor. They must disclose all material information regarding the Proposed Transaction to MedEquities stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

45.     On February 11, 2019, Defendants filed the S-4 with the SEC. A primary purpose

of the S-4 is to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction. However, significant and material facts were not provided to Plaintiff and other Company stockholders. Without that information, MedEquities stockholders cannot make a fully informed decision concerning whether to vote in favor of the Proposed Transaction.

### *Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts*

46.     The S-4 discloses management-prepared financial projections for the Company which are materially misleading. The S-4 indicates that in connection with the rendering of Citi's fairness opinion, Citi reviewed "certain financial forecasts and other information and data relating to MedEquities and Omega which were provided to or discussed with Citi by [their] respective managements." Accordingly, the S-4 should have, but failed to, provide certain information in the projections that MedEquities' management provided to the Board and Citi.

47.     Notably, Defendants failed to disclose the financial projections for MedEquities for fiscal years 2019 to 2023 for: (a) GAAP rental income; (b) cash rental income; (c) straight line rent; (d) interest on notes receivable; (e) EBITDA; (f) depreciation and amortization; (g) stock-based compensation expense; (h) property related expenses; (i) real estate acquisition related expense; (j) general and administrative expenses; (k) operating income; (l) cash interest income; (m) non-cash interest income; (n) interest expense; (o) taxes; (p) net income; (q) capital expenditures; and (r) acquisition costs.

48.     The S-4 further fails to disclose the estimates of NAV range provided to Citi by MedEquities' management and utilized by Citi in its *Selected Public Companies Analysis* and its *Selected Precedent Transactions Analysis*. This omitted information is necessary for MedEquities

stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

### Materially Incomplete and Misleading Disclosures Concerning Citi's Financial Analyses

49.     With respect to the *Discounted Cash Flow Analysis,* the S-4 fails to disclose the individual inputs and assumptions utilized by Citi to derive the discount rate range of 7.9% to 8.7%. The S-4 further fails to disclose the specific terminal year unlevered, after-tax free cash flow metric to which the selected perpetuity growth rates were applied for purposes of this analysis. Additionally, the S-4 fails to disclose the implied terminal EBITDA, adjusted EBITDA, NOI, FFO and/or adjusted FFO multiples resulting from the analysis.

50.     With respect to the *Selected Public Companies Analysis,* the S-4 fails to disclose the individually observed multiples for each of the selected comparable companies, for each of the metrics as calculated by Citi for the analysis, including FFO multiple, EBITDA multiple, and NAV premium/discount. The S-4 also fails to disclose whether Citi performed any type of benchmarking analysis for MedEquities in relation to the selected public companies.

51.     With respect to the *Selected Precedent Transactions Analysis*, the S-4 fails to disclose whether Citi performed any type of benchmarking analysis for MedEquities in relation to the target companies of the selected transactions.

52.     Finally, the S-4 fails to disclose whether Citi performed any analyses to determine the value of the shares of Omega to be received by MedEquities stockholders as a result of the Proposed Transaction.

### Materially Incomplete and Misleading Disclosures Concerning the Flawed Process

53.     The S-4 also fails to disclose material information concerning the sales process. For example, the S-4 fails to state whether the confidentiality agreements MedEquities entered into

with Party A, Party B, and Party D are still in effect and whether those confidentiality agreements are presently precluding any of the parties from making a topping bid for the Company. The S-4 further fails to state whether the Board reviewed and approved the confidentiality agreements before the agreements were executed. Additionally, the S-4 fails to disclose the basis for Party D already having a confidentiality agreement with the Company and when that confidentiality agreement had first been entered into.

54.     The S-4 notes that Citi is the lender under MedEquities' credit facility and term loan. However, the S-4 does not disclose whether persons from Citi negotiating the amendment of the credit facility were involved in communications with Omega concerning the Proposed Transaction. The S-4 further fails to disclose whether the persons from Citi negotiating the amendment were involved in the sales process, including preparing financial analyses, communicating with the Board, or communicating with MedEquities employees. Furthermore, the S-4 does not disclose whether the Board discussed Citi's role as lender under the credit facility (which "significantly limit[ed] MedEquities' access to additional borrowings") when considering Citi as a financial advisor for the Proposed Transaction. Finally, the S-4 does not disclose when the Board learned that Citi had suggested the Proposed Transaction to both Omega and MedEquities.

55.     The S-4 fails to disclose the financial advisors to MedEquities concerning the potential transaction with Party A in 2018. The S-4 further fails to disclose whether the Board considered those financial advisors in connection with the Proposed Transaction, and whether the Board approved the retention of Citi as financial advisor before the engagement letter was signed on October 18, 2018.

56.     Citi provided NAV analyses to Omega on August 16, 2018 and September 5, 2018, yet the S-4 does not include any such analyses. Similarly, Omega shared with MedEquities its valuation model with an illustrative NAV analysis of MedEquities on September 19, 2018, and on September 24, 2018, MedEquities shared its modifications to the NAV analysis and valuation model with Omega. Yet those analyses and valuation models were not included in the S-4.

57.     The S-4 notes that MedEquities' legal and financial advisors began conducting due diligence on Omega in "early October 2018" based on publicly available information. The S-4 does not disclose the basis for MedEquities not conducting due diligence based on internal information until December 21, 2018.

58.     The S-4 fails to disclose the basis for the Board's failure to review and approve the non-disclosure agreement between Omega and MedEquities, as well as the basis for McRoberts not informing the Board of the non-disclosure agreement until October 15, 2018, almost two months after the non-disclosure agreement was signed.

59.     The S-4 does not disclose whether the Board learned of Party D's offer on September 27, 2018.

60.     The S-4 fails to disclose the financial model provided to Citi between October 15, 2018 and October 22, 2018, and a discussion of how that differs from the financial projections included in the S-4. The S-4 further fails to disclose Citi's analysis of Omega's proposal at various exchange ratios, the analysis of an illustrative take-private transaction (including the sensitivity analysis of a potential buyer's internal rates of return), and the preliminary financial analyses of the Company on a stand-alone basis, as provided to the Board on October 22, 2018.

61.     The S-4 fails to disclose whether the Board agreed to entering into the exclusivity agreement with Omega on November 12, 2018.

62.     On November 24, 2018, the CEO of Omega informed McRoberts that Omega would not move forward with the exchange ratio of 0.348 because of changes to its valuation of MedEquities and because Omega's share price had increased. According to the S-4, the next day Defendants McRoberts and Churchey and the Company's legal and financial advisors met to discuss alternatives "to mitigate the risks associated with declines in the Omega common stock price." On November 26, 2018, Citi called Omega to "discuss potential alternatives to mitigate the risks associated with declines in the Omega common stock price." The S-4 fails to disclose the basis for altering the transaction structure to mitigate any decline in Omega stock price given the increase and Omega's statement that Omega's increased price required a change to the exchange ratio.

63.     The S-4 fails to disclose the analysis of Omega's December 13, 2018 offer at various exchange ratios and the preliminary financial analysis of the Company on a stand-alone basis presented by Citi to the Board on December 16, 2018. The S-4 also fails to disclose the financial analyses presented by Citi to members of MedEquities' senior management on December 17, 2018, as well as the analysis presented by Citi to members of MedEquities' senior management and Defendant Churchey on December 19, 2018.

64.     The S-4 notes that On January 1, 2019, McRoberts attended a meeting of the Board's Compensation Committee. During that meeting, the Company's legal counsel discussed a proposed incentive compensation program for senior management to "incentiviz[e] senior management and other employees of MedEquities to remain with the company during the period between signing the merger agreement and the closing of the merger." The S-4 does not disclose whether the Compensation Committee discussed and voted on the proposed incentive

compensation with McRoberts present, when such a program had been discussed with Omega and who had proposed the inventive compensation.

65.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, MedEquities stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

66.     In addition, the Individual Defendants knew or recklessly disregarded that the S-4 omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

67.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the S-4 before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so. The Individual Defendants thus knew or recklessly disregarded that the S-4 omits the material information referenced above and contains the incomplete and misleading information referenced above.

68.     Further, the S-4 indicates that on January 1, 2019, Citi reviewed with the Board its financial analysis of the Merger Consideration delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion of the same date, to the effect that the Merger Consideration was fair, from a financial point of view, to MedEquities stockholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning Citi's financial analyses which has been omitted from the S-4, and thus knew or should have known that such information has been omitted.

69.     Plaintiff, and other Company stockholders, are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

## COUNT I

### Against All Defendants for Violations of
### Section 14(a) of the Exchange Act and Rule 14a-9

70.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

71.     Defendants have filed the S-4 with the SEC with the intention of soliciting MedEquities stockholder support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the S-4, which fails to provide the material information referenced above.

72.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of MedEquities, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

73.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

74.     Specifically, and as detailed above, the S-4 violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of MedEquities shares and the financial analyses performed by Citi in support of its fairness opinion; and (iii) the sales process.

75.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the S-4 is materially misleading and omits material information that is necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the S-4 states that Citi reviewed and discussed its financial analyses with the Board during various meetings including on January 1, 2019, and further states that the Board relied upon Citi's financial analyses and fairness opinion in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

76.     The misrepresentations and omissions in the S-4 are material to Plaintiff and other Company stockholders, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

77.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

78.     The Individual Defendants acted as controlling persons of MedEquities within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of MedEquities and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

79.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to the time the S-4 was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the S-4.

81.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4 purports to describe the various issues and information that the Individual Defendants

reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

82.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

83.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

### RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor against the Defendants jointly and severally, as follows:

A.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing an amendment to the S-4 with the SEC or otherwise disseminating an amendment to the S-4 to MedEquities stockholders unless and until Defendants agree to include the material information identified above in any such amendment;

B.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the S-4;

C.     In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

D.      Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 21, 2019

**LEVI & KORSINSKY, LLP**

/s/ Donald J. Enright
Donald J. Enright (Bar No. 13551)
Elizabeth K. Tripodi
1101 30th Street, N.W., Suite 115
Washington, DC 20007
T: (202) 524-4290
F: (202) 333-2121
Email: denright@zlk.com
        etripodi@zlk.com

**ROWLEY LAW PLLC**
Shane T. Rowley
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514